UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LINDA L. BORTELL, :
:
        Plaintiff, :
:
v. : Civil Action No. 04-0954
: (ESH)
ELI LILLY AND COMPANY, *et al.*, :
:
        Defendants. :
:

## MEMORANDUM OPINION

Before the Court is defendant Eli Lilly and Company's ("Eli Lilly") Motion for Summary Judgment ("Defs.' Mot."), joined by defendants Bristol-Myers Squibb Company ("Bristol-Myers"), Dart Industries, Inc. ("Dart"), GlaxoSmithKline, Inc. ("GSK"), and Premo Pharmaceutical Laboratories, Inc. ("Premo") (collectively "defendants"). Defendants argue that Pennsylvania law governs under the District of Columbia's choice of law rules and, therefore, plaintiff may not rely on market-share liability but must identify the manufacturer of the DES that her mother ingested. (Defs.' Mot. at 5-8.) Defendants further argue that they are entitled to summary judgment because plaintiff cannot produce sufficient evidence to meet her burden under Pennsylvania law. (Defs.' Mot. at 8-14.) For the reasons set forth below, the Court agrees and will grant defendants' motion.

## BACKGROUND

This case presents another chapter in the unfortunate history of diethylstilbestrol, commonly known as DES, a drug frequently prescribed from the 1940's to the 1970's as both a prophylactic and active remedy for pregnancy complications, particularly the prevention of

miscarriages. *See In re DES Cases*, 789 F. Supp. 552, 558 (E.D.N.Y. 1992). The consequences for children whose mothers ingested DES during their pregnancies have been severe and well-documented. *See generally* Cynthia Orenberg, DES: The Complete Story, (St. Martin's 1981). These adverse effects include malformed reproductive organs, infertility, and rare forms of vaginal and cervical cancer in women, *see* R.M. Guiusti, K. Iwamoto & E.E. Hatch, *Diethystilbestrol Revisited: A Review of the Long-term Health Effects*, 122 Ann. Intern. Med. 778-88 (1995); E.E. Hatch et al., *Cancer Risk in Women Exposed to Diethylstilbestrol in Utero*, 280 JAMA 630-34 (1998); Arthur L. Herbst et al., *Adenocarcinoma of the Vagina: Association of Maternal Stilbestrol Therapy With Tumor Appearance in Young Women*, 284 New Engl. J. Med. 878 (1971), and genital malformation, reduced sperm counts and testicular disorders in men. Jorma Toppari *et al.*, *Male Reproductive Health and Environmental Xenoestrogens*, 104 Envtl. Health Perspectives, Supp. 4, 741, 753-54 (1996).

Plaintiff was born in Pennsylvania in 1962 and grew up there, but has lived outside the state since 1985 and is currently a resident of California. (Pl.'s Opposition to Defendant Eli Lilly's Motion for Summary Judgment (Pl.'s Opp'n) at 6.) Plaintiff's mother, Ruth Bortell, took DES during her pregnancy with plaintiff. (Defs.' Mot. at 2). Dr. Emerson Fackler, the physician who prescribed the DES, used the term "diethylstibestrol" in writing the prescription without specifying a particular brand. (Pl.'s Opp'n at 5.) Plaintiff's mother filled Dr. Fackler's prescriptions at the Rea and Derrick Pharmacy in Lemoyne, Pennsylvania. (*Id.* at 2.) In 2001, while a resident of California, plaintiff was diagnosed as infertile. (*Id.*) The following year, her doctor diagnosed her with a T-shaped uterus and stenotic cervix -- classic manifestations of DES exposure. (*Id.*) In December 2002, plaintiff suffered a spontaneous miscarriage. (*Id.*)

On May 7, 2004, plaintiff filed suit against defendants in the Superior Court for the District of Columbia seeking damages for injuries allegedly caused by *in utero* exposure to DES. On June 14, 2004, the case was removed by defendants to federal court under 28 U.S.C. §§ 1332 and 1441(b). Discovery closed on May 6, 2005, and defendants now move for summary judgment.

## ANALYSIS

### I.   Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To be material, the fact must be capable of affecting the outcome of the litigation; to be genuine, the issue must be supported by admissible evidence sufficient for a reasonable trier of fact to find in favor of the non-moving party. *Id.* at 247-48; *see also Laningham v. United States Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987).

To escape summary judgment the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham*, 813 F.2d at 1241. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations

3

omitted). Nevertheless, "because summary judgment is a drastic measure, courts should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue." *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C. Cir. 1986). For this reason, in considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989).

## II.   Choice of Law

A federal court sitting in diversity jurisdiction must apply the choice of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *see also Gray v. Grain Dealers Mutual Ins. Co.*, 871 F.2d 1128, 1129 (D.C. Cir. 1989). The District of Columbia has adopted the "substantial interest" approach to choice of law questions. *Greycoat Hanover F Street Ltd. P'ship v. Liberty Mut. Ins. Co.*, 657 A.2d 764, 767-68 (D.C. 1995). When faced with a choice of law in an action sounding in tort, a court in the District of Columbia will "balance the competing interests of the two jurisdictions, and apply the law of the jurisdiction with the more 'substantial interest' in the resolution of the issue." *Lamphier v. Wash. Hosp. Ctr.*, 524 A.2d 729, 731 (D.C. 1987); *see also Jaffee v. Pallotta Teamworks*, 374 F.3d 1223, 1227 (D.C. Cir. 2004). To determine which state maintains a more substantial interest, a court must apply the factors listed in Section 145 of the Restatement (Second) of Conflict of Laws. *Herbert v. Dist. of Columbia*, 808 A.2d 776, 779 (D.C. 2002). These include: (1) the place of injury; (2) the place where the conduct causing the injury occurred; (3) the

domicile, residence, place of incorporation and place of business of the parties; and (4) the place where the relationship between the parties is centered. Restatement § 145(2).

Plaintiff argues for application of California law, while defendants claim that Pennsylvania law should apply. Before undertaking a full choice of law analysis, under District of Columbia law a court must first determine whether both states have an interest in the application of its law to the dispute, otherwise a "false conflict" exists and the law of the interested state governs. *Biscoe v. Arlington Cty.*, 738 F.2d 1352, 1360 (D.C. Cir. 1984). There is no dispute that the District of Columbia has no interest strong enough to merit application of its law in this case. Because, however, the policies of both California (the state where plaintiff resides) and Pennsylvania (the state where the drug was sold and ingested) would be advanced by application of its law to this dispute, there is a true conflict and the law of the state that "has a greater interest in the controversy" will govern. *Id.*

Considering the first of the factors from Restatement § 145, the Court finds plaintiff's place of injury to be Pennsylvania. Plaintiff was exposed to DES *in utero* in Pennsylvania. The malformation of plaintiff's uterus and cervix occurred when plaintiff's reproductive system matured while she was still a resident of Pennsylvania. Though plaintiff's injuries were not discovered until she lived in California, the place of injury remains Pennsylvania.

Moreover, aside from the manufacture of the drug, most of the conduct causing plaintiff's injuries occurred in Pennsylvania. The drug was shipped from a wholesaler within Pennsylvania to the Rea and Derrick Pharmacy. The drug was prescribed by a doctor in Pennsylvania and dispensed by a Pennsylvania pharmacy. Further, the last act necessary to cause plaintiff's injuries -- her mother's ingestion of the drug -- occurred in Pennsylvania.

The third Restatement factor favors California, since plaintiff is a resident of and domiciled in California, and Eli Lilly is incorporated in Indiana and does business nationally, including in both California and Pennsylvania. Yet, like the first two factors, the fourth Restatement factor -- the center of gravity of the parties' relationship -- favors Pennsylvania. As discussed above, except for the manufacture of the drug and the diagnosis of the injury, all actions relevant to the injury occurred in Pennsylvania. Pennsylvania maintains a strong interest in adjudicating disputes arising from allegedly harmful actions occurring within its borders. Therefore, the Court finds the relationship between the parties to be centered in Pennsylvania.

Plaintiff notes that in a recent case, *Blitsch v. Eli Lilly & Co.*, No. 04-cv-0131 (C.D. Cal.), Eli Lilly advocated against applying the law of the place where plaintiff was born. While plaintiff may be correct that defendant has adopted conflicting litigation positions (Pl.'s Opp'n at 12, App. 15), the Court cannot determine from the pleading excerpt provided whether the two cases are identical. The excerpt fails to indicate where plaintiff's mother ingested the drug -- one of the critical elements in this Court's decision. (*Id.*) Moreover, the plaintiff in *Blitsch* moved away from her birthplace at a much younger age, strengthening the interest of her current domicile. Further, recent cases in this District have applied the law of the place of place of exposure, rather than manifestation. *See, e.g., Galvin v. Eli Lilly & Co.*, No. 03-cv-1797 (D.D.C. June 10, 2005) (Mem. Op.) (applying law of place of exposure and current domicile rather than place of manifestation); *Dunseth v. Eli Lilly & Co.*, No. 03-cv-2123 (D.D.C. Sept. 16, 2005) (Mem. Op.) (applying law of birthplace and place of exposure). Therefore, because three of the four factors from Restatement § 145 favor Pennsylvania as the most interested forum, the Court will apply Pennsylvania law in considering defendants' Motion for Summary Judgment.

## III. Pennsylvania Law

DES cases often present problems of proof for a plaintiff. The length of time between exposure and discovery of the injury is often well in excess of 20 years, making it difficult for the plaintiff to locate witnesses and for those witnesses to recall facts with certainty. Often relevant documents have been destroyed or misplaced. Given the multitude of DES manufacturers marketing identical versions of DES during the mid-20th Century, isolating the specific manufacturer responsible for any individual plaintiff's injuries can be a daunting task. Consequently, some states have adopted a theory of market share liability for DES injuries. *See Sindell v. Abbott Labs.*, 607 P.2d 924 (Cal. 1980); *Collins v. Eli Lilly Co.*, 342 N.W.2d 37 (Wis. 1984); *Martin v. Abbott Labs.*, 689 P.2d 368 (Wash. 1984); *Hymowitz v. Eli Lilly & Co.*, 539 N.E.2d 1069 (N.Y. 1989); *Conley v. Boyle Drug Co.*, 570 So.2d 275 (Fla. 1990); and *Smith v. Cutter Biological, Inc.*, 823 P.2d 717 (Haw. 1991). Market share liability holds that, under certain circumstances, a plaintiff need not prove which manufacturer of a fungible product specifically caused her injuries; instead liability is imposed based on each defendant's share of the marketplace at the time of the injury. *See, e.g., Sindell*, 607 P.2d at 937-38.

The Supreme Court of Pennsylvania has not taken up the question of how to apportion liability in a DES exposure case. It has, however, rejected the use of market share liability in lead poisoning cases. *Skipworth v. Lead Indus. Ass'n, Inc.*, 690 A.2d 169 (Pa. 1997). In *Skipworth*, the court stated Pennsylvania's general rule of tort liability: "a plaintiff, in order to recover, must establish that a particular defendant's negligence was the proximate cause of her injuries." *Id.* at 172. *See also Cuthbert v. City of Philadelphia*, 209 A.2d 261, 263 (Pa. 1965). "Adoption of the market share liability theory," the court noted, "would result in a significant

7

departure from this rule." *Skipworth*, 690 A.2d at 172. Nevertheless, the *Skipworth* decision is not without ambiguity. The Pennsylvania Supreme Court explained its rejection of market share liability for lead paint manufacturers by comparing the circumstances of lead paint exposure with those of DES. *Id.* at 172-73. It found that the factors justifying application of market share liability in DES cases -- product fungibility and a known time of injury -- were not present with respect to lead poisoning. *Id.* Thus, the court held that "application of market share liability *to lead paint cases* would grotesquely distort liability." *Id.* at 173 (emphasis added).

The *Skipworth* decision appears to leave open the question of whether Pennsylvania might adopt market share liability with respect to DES cases. (*Id.* at 172 (acknowledging "that there may arise a situation which would compel us to depart from our time-tested general rule [requiring proof of proximate cause]")). Since *Skipworth*, however, no Pennsylvania court has applied market share liability in a DES case. Moreover, prior to *Skipworth*, the lower courts of Pennsylvania were largely in agreement that market share liability was not permitted under Pennsylvania law. Market share liability has been specifically rejected in the context of asbestos exposure, *Eckenrod v. GAF Corp.*, 544 A.2d 50 (Pa. Super. Ct. 1988), and where a defective tire rim exploded. *Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963 (Pa. Super. Ct. 1985). *See also Burnside v. Abbott Labs.*, 505 A.2d 973 (Pa. Super. Ct. 1986) (declining to decide whether market share liability applied to DES exposure claim). *But see Erlich v. Abbott Labs.*, 5 Phila. Co. Rptr. 249 (Pa. Com. Pl. 1981) (permitting alternative liability in DES case under Section 433(B)(3) of the Restatement (Second) of Torts but using market share liability theory).

In the absence of any post-*Skipworth* decision by a Pennsylvania court permitting recovery under a theory of market share liability, it is not the place of a federal court sitting in

8

diversity to do so. *See Wisniewski v. Johns-Manville Corp.*, 759 F.2d 271, 274 (3d Cir. 1985) ("We leave to . . . the state legislatures and, where relevant, to the state courts the task of expanding or restricting liability."). "Our role is to apply the current law of the appropriate jurisdiction, and leave it undisturbed." *City of Philadelphia v. Lead Indus. Ass'n, Inc.*, 994 F.2d 112, 123 (3d Cir. 1993) (declining to apply market share liability under Pennsylvania law). Thus, "absent some authoritative signal from the legislature or the [state courts], we see no basis for even considering the pros and cons of innovative theories." *Dayton v. Peck, Stow & Wilcox Co.*, 739 F.2d 690, 694 (1st Cir. 1984). In short, " '[w]e must apply the law of the forum as we infer it presently to be, not as it might come to be.' " *Tidler v. Eli Lilly & Co.*, 851 F.2d 418, 424 (D.C. Cir. 1988) (quoting *Dayton*, 739 F.2d at 694-95). The application of this principle of jurisprudence admits of only one conclusion: at this time, market share liability is not a viable theory for recovery in a products liability suit under Pennsylvania law.

## IV.   The Evidence

Under Pennsylvania law, in order to survive summary judgment, plaintiff must create a genuine issue as to the identity of the specific manufacturer whose pills were ingested by her mother during her pregnancy. *See Mellon v. Barre-National Drug Co.*, 636 A.2d 187, 191 (Pa. Super. Ct. 1993) ("Proof of causation is a necessary element in a products liability action."); *City of Philadelphia*, 994 F.2d at 123 ("A plaintiff must establish that a particular product of a defendant manufacturer caused her injuries.").

As an initial matter, plaintiff has proffered no evidence that the pills ingested by plaintiff's mother were manufactured by any defendant other than Eli Lilly. She has, therefore, failed to create a genuine issue of material fact with respect to defendants Bristol-Myers, Dart,

GSK and Premo, and their motions for summary judgment must be granted. Plaintiff has, however, introduced evidence of Eli Lilly's responsibility, and the Court must now determine whether it is sufficient to permit a reasonable jury to find for plaintiff. *Dunaway v. Int'l Bhd. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002).

Plaintiff introduces several pieces of evidence to support her claim that Eli Lilly produced the DES that caused her injuries. First is the testimony of her mother. In her deposition, Ruth Bortell described the pills she took as white, round, uncoated, flat, and about the size of an asprin. (Pl.'s Opp'n at 4, App. 6.) She further testified that the name of the pill began with a "D" and had an "ethyl" in the middle. (*Id.*) The testimony of Ruth Bortell is corroborated by Dr. Fackler, who testified that he wrote prescriptions for DES as "diethystilbestrol" (Pl.'s Opp'n at 5, App. 18), and by photographic evidence that Lilly's pills were sold under the generic name diethylstilbestrol and generally conform to Ruth Bortell's description. (Pl.'s Opp'n at 5, App. 19; Defs.' Reply at 4 (admitting ¶ 12 of Pl.'s Opp'n).) Eli Lilly counters with evidence that over 90 different manufacturers were producing DES at that time (Defs.' Mot., Exs. 5 & 6), and that at least two other manufacturers made DES pills that match plaintiff's description. (Defs.' Mot. at 10). Moreover, at least one of those manufacturers, Hance Brothers and White, was located in Pennsylvania and distributed "the predominant amount of stilbestrol" in Philadelphia. (Defs.' Mot., Ex. 9 (Bialek Tr. at 13-14).)

In light of Eli Lilly's evidence that another manufacturer made similar looking pills that were distributed within Pennsylvania, plaintiff must produce sufficient evidence to convince a reasonable jury that the pills matching Ruth Bortell's description carried or distributed by the Rea and Derrick Pharmacy in Lemoyne were those of Eli Lilly. Without such evidence, plaintiff

10

cannot meet her burden to prove causation under Pennsylvania law. *Mellon*, 636 A.2d at 191. Toward this end, plaintiff introduces affidavits from two pharmacists who worked at the Rea and Derrick Pharmacy in 1962. (Pl.'s Opp'n, App. 7 (Bannan Aff.) & App. 8 (Krick Aff.).) The affidavits, copies of which are appended to this Memorandum Opinion, are identical form affidavits, which indicate the time period during which each pharmacist worked at the pharmacy and state that "in the 1960's, if a prescription for DES was brought into the pharmacy, the Lilly brand would have been dispensed." (*Id.*) Serious questions exist, however, regarding the admissibility of these affidavits.

Ordinarily a court may grant summary judgment on the basis of sworn affidavits, *Echostar Commc'ns Corp. v. FCC*, 292 F.3d 749, 753 (D.C. Cir. 2002), as long as they comply with Fed. R. Civ. Pro. 56, which requires that affidavits "be made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e). A court may consider affidavits submitted in compliance with Rule 56(e) as evidence, even though a sworn declaration remains "technically hearsay." *Echostar*, 292 F.3d at 753. Because summary judgment substitutes for trial, however, affidavits under Rule 56 must "consist only of admissible evidence." *Cobell v. Norton*, 391 F.3d 251, 261 (D.C. Cir. 2004).

There is little doubt that, were Krick and Bannan available to testify at trial, their affidavits would meet the requirements of Rule 56(e). Facially, at least, the affidavits are based on personal knowledge and relate to admissible evidence. Unfortunately for plaintiff, neither Bannan nor Krick will be able to testify at trial. Mr. Bannan died on June 10, 2005. (Defs.' Mot. at 11.) Mr. Krick suffers from dementia and is not expected to be competent to testify. (Pl.'s

11

Opp'n, App. 30 (Wilma Krick Aff.); Defs.' Mot. at 13-14, Gransky Aff. Ex. 14 (Michalek Supp. Statement.).)[1/] Thus, plaintiff has not shown that the affiants are "competent to testify to the matters contained" in their affidavits. Fed. R. Evid. 56(e). Without Mr. Krick's and Mr. Bannan's availability to testify and undergo cross-examination either at trial or in a pre-trial deposition, the Court cannot credit the affidavits as anything more than hearsay.

Plaintiff nonetheless argues that the affidavits are admissible under the Fed. R. Evid. 807, which provides a catch-all exception to the general prohibition on the admissibility of hearsay evidence found in Fed. R. Evid. 802. Rule 807 provides:

> a statement not specifically covered by [another hearsay exception] but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

---

[1/] According to his treating physician, Mr. Krick appears to suffer from Lewy's Body Disease, the symptoms of which are similar to Alzheimer's Disease. (Michalek Supp. Statement.) Both his treating physician and his wife believe his dementia to be so advanced as to preclude testimony at trial. (Wilma Krick Aff.; Michalek Supp. Statement.) Plaintiff has submitted a statement by one of her lawyers, Brandon Levine, attesting to his belief that Mr. Krick is competent to testify. (Pl.'s Opp'n, App. 29.) While it is true that this evidence must be viewed in the light most favorable to plaintiff, the Court will not credit a lawyer's testimony regarding a matter about which he is not competent to testify, particularly when plaintiff's faith in Mr. Krick's competence could have been tested by taking his deposition at any point during the discovery period. Plaintiff moved to strike Dr. Michalek's Supplemental Statement on the grounds that it lacks foundation as to her basis for her diagnosis and her qualifications to testify to Mr. Krick's condition. (Pl.'s Mot. to Strike.) While Dr. Michalek's affidavit is lacking in detail, it remains probative on the issue of Mr. Krick's competence. Plaintiff has introduced no evidence, other than the lay opinion of plaintiff's counsel, that counters Dr. Michalek's medical diagnosis. Moreover, as discussed *infra*, plaintiff's claim of Mr. Krick's competence is further belied by her failure to depose him. Thus, plaintiff's Motion to Strike is denied.

Fed. R. Evid. 807. The residual exception of Rule 807 is "extremely narrow." *United States v. Washington*, 106 F.3d 983, 1001 (D.C. Cir. 1997). A court must be "confident ... that the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." *Lilly v. Virginia*, 527 U.S. 116, 136 (1999) (internal quotation marks omitted). Thus, proponents of an admission under Rule 807 bear "a heavy burden to come forward with indicia of both trustworthiness and probative force." *Washington*. 106 F.3d at 1002. Such indicia simply do not exist with respect to the Bannan and Krick affidavits.

For instance, the affidavits are pre-typed forms that require a declarant merely to "fill-in-the-blank" with facts regarding the manufacturer and practices of the pharmacy. (*See* Bannan Aff.; Krick Aff.) While it is not clear whether the forms were completely filled out before Mr. Bannan and Mr. Krick affixed their signatures, it is clear that the majority of the form was not filled out by either affiant. Alan Vogenberg, a investigator pharmacist paid by plaintiff's law firm interviewed Mr. Bannan and Mr. Krick and provided them "a prepared statement" for their signature. (Pl.'s Opp'n, App. 9 (Vogenberg Aff.).) The Bannan and Krick affidavits, moreover, appear to be facially inconsistent with the factual account provided by the Vogenberg affidavit. Mr. Vogenberg claims that "each told [him] that Hensel and Sons was the wholesaler that supplied Rea and Derrick Pharmacy" (*id.*), yet the Krick and Bannan Affidavits list two wholesalers -- Hensel & Sons and Drug House. (*See* Bannan Aff.; Krick Aff.) Such inconsistency immediately calls into question the trustworthiness and probity of these affidavits. Further, there is at least a serious question as to whether Mr. Bannan repudiated the content of his affidavit prior to his death. According to an affidavit filed by defense counsel Ericka Snyder, Mr.

Bannan stated during a telephone interview that he had no recollection of signing the affidavit proffered by plaintiff. (Snyder Aff. ¶ 7.) Moreover, he recalled the Lilly DES tablets dispensed at the Rea and Derrick Pharmacy to be red, coated tablets and that the small, white, uncoated tablets were produced by a generic manufacturer. (*Id.* ¶ 4.) While the Snyder affidavit is itself inadmissible hearsay, at a minimum it raises concern regarding the reliability of the Bannan affidavit. With respect to Mr. Krick, the statement submitted by Dr. Michalek places the onset of Krick's symptoms related to Lewy body disease at early 2004, pre-dating his signing of the affidavit proffered by plaintiff. (Michalek Supp. Statement.) Despite counter-testimony by Mr. Krick's wife (Wilma Krick Aff.) and a neighbor, Maryellen Simpson (Pl.'s Opp'n, App. 31 (Simpson Aff.)), that Mr. Krick was competent at the time he signed the affidavit, Dr. Michalek's statement provides a reason to question whether Mr. Krick's illness compromised the trustworthiness of his affidavit.[2]

Most importantly, the Bannan and Krick affidavits fail to comport with the terms of Fed. R. Evid. 807(B): that "through reasonable efforts" the proponent could not have procured more probative evidence. Mr. Krick signed his affidavit on May 24, 2004; Mr. Bannan, two days later. By failing to depose either Mr. Bannan or Mr. Krick during the year after obtaining their affidavits despite knowledge of the affiants' elderly age,[3] plaintiff failed to engage in "reasonable

---

[2] Even without Dr. Michalek's statement, the circumstances surrounding the signing of Mr. Krick's affidavit and the plaintiff's failure to depose him at any time since then cast sufficient doubt on the trustworthiness and probity of the affidavit to disqualify it from admission under Rule 807.

[3] Bannan was 85 when he signed the affidavit. (Defs.' Mot., Ex. 12.) Though the record does not indicate Mr. Krick's specific date of birth, he graduated from pharmacy school 11 years after Mr. Bannan (*cf.* Bannan Aff. & Krick Aff.) and thus was likely in his 70's when he signed the affidavit.

efforts" to preserve their testimony for trial. Even now, plaintiff claims that Mr. Krick is competent to testify, yet she inexplicably cancelled his deposition that had been noticed for July 15, 2005. (Defs.' Reply at 3.) Plaintiff's failure to pursue Mr. Krick's deposition makes it impossible for the Court to credit her lawyer's affidavit attesting to Mr. Krick's competence. Despite the Supreme Court's admonition in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), that "Rule 56 does not require the non-moving party to depose her own witnesses," *id.* at 324, it remains the obligation of the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* (internal quotation marks omitted). Plaintiff cannot fail to preserve evidence critical to her case and then attempt to blame Eli Lilly for not deposing Mr. Krick and Mr. Bannan. Thus, since plaintiff failed to expend reasonable efforts to obtain properly admissible evidence, the Court finds that the Krick and Bannan affidavits are not admissible under the residual exception of Fed. R. Evid. 807.[4]

Plaintiff further argues that even if the affidavits will not constitute admissible evidence at trial, the Court may still consider them at the summary judgment stage. In support, plaintiff

---

[4] Without the Krick and Bannan affidavits, plaintiff has no evidence regarding the identity of the distributor who supplied the pharmacy with DES. Thus, the Court cannot consider the import of the distribution contract that purportedly reflects the terms agreed to by Eli Lilly and its distributor. (Pl.'s Opp'n, App. 14.) Even with the Krick and Bannan affidavits, plaintiff's evidence regarding the distributor is shaky at best. Though the Vogenberg affidavit states that Krick and Bannan identified Hensel & Sons as the pharmacy's distributor during Vogenberg's interviews with them (Pl.'s Opp'n, App. 9 (Vogenberg Aff.)), the affidavits signed by Krick and Bannan identify two distributors -- Hensel & Sons and Drug House, both out of Harrisburg, Pennsylvania. (Krick Aff. & Bannan Aff.) Further, the copies of the distribution contract attached to the plaintiff's Opposition and the defendants' Reply are not signed by either party and therefore cannot be definitively linked to a particular distributor. Moreover, the language of the contract -- that the distributor shall not "give preference to any other brand of products when no brand is specified, " (Pl.'s Opp'n, App. 14) -- is not conclusive on the issue of whether the pharmacy ever specified a brand other than Eli Lilly when ordering from the distributor.

cites *Celotex*, in which the Supreme Court observed that the non-moving party need not "produce evidence in a form that would be admissible at trial in order to avoid summary judgment." *Id.* at 324. Plaintiff interprets that language to mean that so long as the content of the affidavit consists of evidence that could be admissible in some form, a district court may consider the affidavit at the summary judgment stage, regardless of whether plaintiff has any vehicle for admitting the evidence at trial. (Pl.'s Opp'n at 18.) The weight of authority does not support this novel proposition, for the general rule is that "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. U.S.*, 20 F.3d 222, 226 (6th Cir. 1994). Even after *Celotex*, it is "well-settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyenne v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

The majority of circuits interpret *Celotex* to permit consideration of evidence submitted at summary judgment in non-admissible form only when "the content of the statements will be reduced to admissible form at trial." *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996). *See also Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990) ("[A]bsent a showing of admissibility -- and none was forthcoming here -- appellant may not rely on rank hearsay . . . to oppose proper motions for summary judgment."). Both the D.C. Circuit and the Third Circuit reject the notion that evidence that cannot be reduced to an admissible form may properly be considered at summary judgment. In *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365 (D.C. Cir. 2000), the D.C. Circuit held that any evidence considered by a court at the summary judgment stage "must be capable of being converted into admissible evidence." *Id.* at 1369. Similarly, the Third Circuit has ruled that "hearsay evidence produced in an affidavit

16

opposing summary judgment may be considered *if the out-of-court declarant could later present the evidence through direct testimony, i.e., in a form that would be admissible at trial.*" *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990) (emphasis added) (internal quotation marks omitted).

Even the cases cited by plaintiff fail to support her argument. In *Reeder v. Harper*, 788 N.E.2d 1236 (Ind. 2003), the Indiana Supreme Court held that "an affidavit that would be inadmissible at trial may be considered at the summary judgment stage of the proceedings if the substance of the affidavit would be admissible in another form at trial." *Id.* at 1241-42. Notably, the Indiana Supreme Court viewed its opinion as largely consistent with that of most federal courts, which permit evidence presented in non-admissible form to be considered only "if that evidence can be rendered admissible at trial." *Reeder*, 788 N.E.2d at 1240. Though the Indiana Supreme Court permitted consideration of an affidavit by a doctor who died after providing an affidavit but before trial and before he could be deposed, it did so because another expert witness could easily testify to the same facts. *Id.* at 1242. Here, there is nothing in the record to indicate that anyone other than Mr. Bannan or Mr. Krick can testify as to the practices of the Rea and Derrick Pharmacy between 1962 and 1963. Plaintiff also relies on *Oto v. Metro. Life Ins. Co.*, 224 F.3d 601 (7th Cir. 2000), in which the Seventh Circuit held that to confuse the admissibility of an affidavit at trial with its use at the summary judgment stage would "require [the Court] to read a 'cross-examination' requirement into Rule 56 that is not there." *Id.* at 604. Yet in *Oto*, the objecting party not only had the opportunity to cross-examine the affiant regarding the contents of the contested affidavit, but in fact did so. *Id.* Thus, the Seventh Circuit's discussion of the admissibility of the affidavit in the absence of cross-examination is largely dicta. To the

extent that it is not dicta, it is inconsistent with the near-uniform approach to this issue by most federal circuits, including this circuit's jurisprudence.

Without the Bannan and Krick Affidavits, plaintiff's evidence on the issue of causation consists solely of her mother's description of the DES pill that she ingested -- a description that matches both Eli Lilly's pills and those of another manufacturer who distributed its product within Pennsylvania. Even viewed in the light most favorable to plaintiff, such slim evidence is insufficient to permit a reasonable jury to find that Eli Lilly is more likely than not the cause of plaintiff's injuries. The facts of this case are similar to those in *Galvin v. Eli Lilly and Co.*, No. 03-cv-1797 (D.D.C. June 10, 2005) (Mem. Op.), in which the Court held that testimony describing the product as a "round," "little white pill with a cross," was insufficient to defeat summary judgment where defendant introduced evidence of another manufacturer who distributed a pill that also matched plaintiff's description. *Id.*

As a counterweight to *Galvin*, plaintiff relies on *Dunseth v. Eli Lilly and Co.*, No. 03-cv-2123 (D.D.C. Sept. 16, 2005) (Mem. Op.), in which the Court denied summary judgment. One critical fact, however, separates *Dunseth* from both *Galvin* and this case -- an affidavit from a local pharmacist linking the mother's description of the DES pill she ingested with a single, specific manufacturer. *Id.* But absent the Bannan and Krick affidavits, plaintiff cannot provide the necessary evidentiary link that existed in *Dunseth*.[5] Plaintiff also points to *Kogen v. Eli Lilly*

---

[5] Even the Vogenberg affidavit (Pl.'s Opp'n, App. 9), which provides plaintiff's best evidence on pharmacy practices aside from the Krick and Bannan affidavits, is too general to meet plaintiff's burden. Vogenberg states merely that he is "familiar with the practices stocking and dispensing of DES in the 1960's" and that "everyone stocked Lilly's DES as the number one brand to be used." (*Id.*) The affidavit contains no geographic limitation, and thus is not probative on the issue of what DES was stocked and distributed in the relevant region of Pennsylvania.

*and Co.*, No. 03-cv-962 (C.D. Ca. July 22, 2003) (Order); *Woolfolk v. Eli Lilly and Co., et al.*, No. 03-cv-3577 (W.D. Wash. Mar. 15, 2005) (Order on Motion for Summary Judgment); and *Brooks v. Eli Lilly and Co. et al.*, No. 03-cv-1796 (D.D.C.) (Minute Order, July 28, 2005) (adopting rationale in *Woolfolk*), as cases in which the courts denied summary judgment based merely on the mother's description of the pill. Yet each of these cases suffers from the same fatal flaw: they appertain to jurisdictions (*i.e.*, California and Washington) that have adopted market share liability for DES actions. In a market share liability jurisdiction, proof as to a particular defendant's responsibility has zero relevance; the same can be said for the precedential value to this action of an opinion from a market share liability jurisdiction. In fact, in *Woolfolk* (which is the only case cited in *Brooks*) the court did not even address the issue of whether there was sufficient evidence linking defendant to the pill ingested. Rather, the sole issue was whether there was sufficient evidence that plaintiff's mother had ingested DES.

## CONCLUSION

For the foregoing reasons, defendants Bristol-Myers', Dart's, GSK's, Premo's and Eli Lilly's Motions for Summary Judgment are granted. Plaintiff's Motion to Strike the Supplemental Statement of Maria Michalek is denied. An appropriate Order accompanies this Memorandum Opinion.

_____s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date: October 19, 2005